**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**CIVIL ACTION NO. 06-479-C**

**CATHY R. MATTINGLY,** **PLAINTIFF,**

**V.** **MEMORANDUM OPINION AND ORDER**

**PRIMERICA LIFE INSURANCE CO., ET AL.,** **DEFENDANTS.**

* * * * * * * * * * *

The plaintiff's insurance claim having been denied after her husband's death, she filed suit against Primerica Life Insurance Company ("Primerica") in state court, demanding full insurance proceeds (plus interest), compensatory damages for mental anguish and related financial losses, punitive damages for alleged bad faith, and attorney's fees.  (DE 1-2 at 5-6.)  Primerica removed the suit to this court and filed a third-party complaint against Beal Bank, SSB ("Beal Bank").

This matter is before the court on the plaintiff's motion for summary judgment (DE 15), the motion by Primerica to dismiss and for leave to deposit insurance proceeds (DE 20), and the motion for summary judgment by Beal Bank (DE 22).  The court, having reviewed the record and being otherwise advised, will grant Primerica's motion (DE 20), will deny the motion of the plaintiff (DE 15)' and will grant Beal Bank's motion (DE 22).

**I.    BACKGROUND**

On July 12, 1983, George Mattingly, the deceased husband of the plaintiff, Cathy Mattingly, acquired a $30,000 base life insurance policy from Massachusetts

Indemnity and Life Insurance Company ("MILICO"), with the policy number 0410558291.  Included in the policy summary was a "15 y[ea]r step rated term to age 85 spouse rider" worth $20,000, *see* DE 15-3 at 3, which the plaintiff now claims was "essentially a separate policy . . . insuring the life of Cathy Mattingly[,]" *see* DE 15-2 at 1.  The defendant/third-party plaintiff, Primerica, is the successor in interest to MILICO on this policy.

On April 19, 1988, George Mattingly assigned this life insurance policy to the United States Small Business Administration ("SBA"), as collateral on a loan of $89,700.  More specifically, he agreed to "assign[] . . . Policy No. 041055891 issued by the Massachusetts Indemnity and Life Insurance Company . . . *and any supplemental contracts issued in connection therewith* (said policy and contracts being herein called the "Policy"), upon the life of George R. Mattingly" to the SBA and its successors.  (DE 22-3 at 1 (emphasis added).)  Despite this apparently plain language, which is taken from the very first clause of the assignment, the plaintiff now alleges that "[t]he rider was never assigned to the SBA[,]" a contested claim at the center of the current litigation.  (DE 15-2 at 1.)  It is undisputed, however, that the third-party defendant, Beal Bank, is the rightful successor to the SBA under this assignment, and the plaintiff further concedes "that Beal Bank . . . has a valid claim as to the $30,000 policy assigned to the SBA in 1988."  *Id.* at 2.  Moreover, both the plaintiff and Beal Bank agree that George Mattingly's loan with the SBA was also secured by a mortgage on certain real property, but the plaintiff makes the

2

further claim that this mortgage was "the primary collateral" on the loan, which was only "additionally secured by the life insurance assignment." *Id.*

On July 12, 1990, George Mattingly modified his insurance policy with MILICO, replacing the initial $20,000 spouse rider with a "15 y[ea]r step prem term rider to age 85" worth $70,000. (DE 15-4 at 3.) Again, according to the plaintiff, this amended spouse rider was actually a "second policy . . .[and only] nominally called a rider." (DE 15-2 at 2.) The plaintiff also claims that "[n]o additional assignment was made to the SBA as to th[is] second policy"; indeed, she suggests that neither the SBA nor its successors was "even aware that the second policy existed." *Id.*

In September 2001, the plaintiff and George Mattingly d/b/a Matt's Farmers Market filed for bankruptcy in the Western District of Kentucky. According to the plaintiff, the real property securing George Mattingly's loan with the SBA "was surrendered to Beal Bank in 2001 in connection with the Bankruptcy[,]" and the plaintiff further claims that although "Beal Bank has had nearly 6 years to complete foreclosure proceedings" on this real property, it has not done so. (DE 24-1 at 2.) Beal Bank does not seriously contest these allegations, although it does claim that it "has sought foreclosure on the mortgaged premises" in an action currently pending in Kentucky state court. (DE 22-2 at 6 n.3.)

George Mattingly died on September 1, 2005, and the plaintiff demanded payment under his life insurance policy from Primerica shortly after his death. The

plaintiff claims Primerica initially acknowledged her as a proper claimant and supplied her with claim forms.  In any event, Primerica soon learned of Beal Bank's competing claim, and because of its "great doubt as to which party is entitled to be paid the amount of the policy[,]" Primerica refused to pay the policy proceeds to either party.  (DE 20 at 3.)

The only real issue for the court is whether the plaintiff or Beal Bank is entitled to the proceeds from the life insurance policy.[1]  Beal Bank argues that when the court applies "the unambiguous terms of the Assignment, Note and the law to the facts of this case[,]" the court must conclude that Beal Bank "is entitled to summary judgment allowing it to collect the full $100,000 proceeds of the Policy" (DE 22-2 at 3.)  The plaintiff, on the other hand, claims that Beal Bank has proceeded in a "dilatory" and "unconscionable" manner in pursuing its interests under the loan and assignment, and she argues that the additional $70,000 of coverage due under the amended spouse rider was never intended to be exposed as collateral.  (*See* DE 24-1 at 2, DE 15-2 at 2-4.)  Primerica claims that resolution of

---

[1]  According to Beal Bank, at the time of its motion for summary judgment, the policy and its accrued interest were worth in excess of $120,000.  Beal Bank seeks this sum, any further accrued interest, and its attorney's fees and costs. (DE 22-2 at 2.)  For her part, the plaintiff has submitted two proposed orders. According to the plaintiff's first proposed order, Beal Bank is entitled to the initial sum of $30,000, while she is entitled to all remaining proceeds from the policy, *see* DE 15-6 at 1; according to the plaintiff's second proposed order, she is entitled to all of the proceeds from the policy, *see* DE 24-2 at 1.  The plaintiff has not provided any explanation for this variance, and the court finds no basis to depart from the plaintiff's earlier concession.  Accordingly, as an initial matter, the court finds that Beal Bank is entitled to the sum of $30,000, plus its accrued interest, due under the base policy.

4

the only real disputed issue before the court neither involves its interests nor requires its continued participation.  Therefore, Primerica seeks to have the court dismiss the plaintiff's claims against it and to deposit the proceeds of the policy into a court-controlled account.  These claims are discussed in greater detail below.

## II.   STANDARD OF REVIEW

"Summary judgment is proper where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (citing Fed. R. Civ. P. 56(c)). A principal purpose of the summary-judgment rule is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In ruling on a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the opposing party.  *Id.*  A judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue exists only when there is sufficient evidence on which the jury could reasonably find for the opposing party.  *Browning*, 283 F.3d at 769 (quoting *Anderson*, 477 U.S. at 252).

The initial burden of showing the absence of a genuine issue of material fact is on the moving party.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in *Matsushita*).  Evidence that is "merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 249 (internal citations omitted).  Furthermore, "the moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only 'show – that is, point out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (quoting *Celotex*, 477 U.S. at 325).

Dismissal is proper where the movant establishes beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  In reviewing a motion to dismiss, the court considers the pleadings in the light most favorable to the plaintiffs, and the factual allegations in the complaint are assumed to be true. *Jones v. Carlisle*, 3 F.3d 945, 947 (1993).

**III.    ANALYSIS**

**A.    Primerica's Motions To Deposit the Insurance Proceeds and To Dismiss (DE 20)**

Because "[t]he only dispute at issue" in this case "is to whom payment of the policy proceeds should be made[,]" Primerica claims it should be permitted to deposit the disputed proceeds from the life insurance policy into the court.  (DE 20

6

at 3.)  Primerica also claims that both the plaintiff and Beal Bank agree with this course of action, and indeed, no contrary response has been filed.  Finally, Primerica claims that "[i]n exchange for paying said sums into Court, Plaintiff has agreed to dismiss all claims against Primerica Life Insurance Company with each party to bear its own costs."  *Id.* at 4.  Again, no contrary response has been filed. Accordingly, the court will grant Primerica's motions to deposit the insurance proceeds into court and to dismiss.

**B.    The Plaintiff's and Beal Bank's Cross-Motions for Summary Judgment (DE 15, DE 22)**

"It is firmly established that a lien 'rides through' bankruptcy unaffected, unless the lien is disallowed or avoided."  *In re Willis*, 199 B.R. 153, 154 (Bankr. W.D. Ky. 1995) (citing, inter alia, *Johnson v. Home State Bank*, 501 U.S. 78 (1991)).  By "rides through unaffected," the court means that a "secured creditor can if he wants ignore the bankruptcy proceeding and enforce his security interest." *J. Catton Farms, Inc. v. First Nat'l Bank*, 779 F.2d 1242, 1247 (7th Cir. 1985); *see also Willis*, 199 B.R. at 154 (citing *J. Catton Farms* for the same proposition). In other words, although "the discharge in bankruptcy . . . extinguishes the personal liability of the bankrupt" for "debts falling within the purview of the act," it "does not affect the lien on an insurance contract created by a valid pledge." *Mercer Nat'l Bank v. White's Ex'r*, 32 S.W.2d 734, 737 (Ky. 1930).  The court finds, therefore, that Beal Bank's interest in the insurance policy survived the bankruptcy proceedings.

7

The plaintiff argues that Beal Bank has an obligation to seek satisfaction on its loan by seeking to enforce the mortgage on the real property before seeking to collect under the assigned life insurance policy.  The plaintiff relies heavily on *Schum v. Lawrenceburg Nat'l Bank*, 234 S.W.2d 962, 965 (Ky. 1950), for the proposition that when the debt of an insured is secured both by a mortgage and the assignment of a life insurance policy, "the intention of the insured is the controlling factor in determining the rights of the parties."  The plaintiff argues that because "[t]here is no indication in the assignment of Mr. Mattingly's intent to place the assignment before the mortgage, . . . Beal Bank must first seek collection . . . against the real property and . . . then seek to collect the remaining balance owed from the insurance proceeds" if the foreclosure sale does not satisfy the amount of the loan.  (DE 15-2 at 4.)

*Schum* presents issues of fact and law very similar to this matter: in *Schum*, the beneficiary of a life insurance policy which had been used to secure a loan, along with other mortgaged personal property, argued "that the bank must first exhaust the proceeds from the sale of the mortgaged chattels before resorting to the insurance money."  234 S.W.2d at 964.  In *Schum*, however, "there was nothing in the mortgages or assignments indicating an intent that the proceeds of the policies should first be resorted to for payment of the debt[,]" but there were "contrary" indications that the mortgages were to be used first; for example, the insured in *Schum* "divested himself of all title to the mortgaged property, and

8

directed the bank to sell it and apply the proceeds in payment of the debt." *Id.* at

965.  The plaintiff has not shown that George Mattingly made any such indications

with respect to the mortgaged real property in this matter.  Moreover, and also

unlike *Schum*, the assignment contract in this matter contains specific language

about the lender's discretion over the priority of the collateral.  More specifically,

Clause "I" of the assignment reads as follows:

> [t]he Assignee may take or release other security, may release any
> party primarily or secondarily liable for any of the Liabilities, may grant
> extensions, renewals or indulgences with respect to the Liabilities, or
> may apply to the Liabilities *in such order as the Assignee shall
> determine*, the proceeds of the Policy hereby assigned or any amount
> received on account of the Policy or by the exercise of any right
> permitted under this assignment, without resorting or regard to other
> security.

(DE 15-5 at 1, DE 22-3 at 2 (emphasis added).)

In general, although the intent of the insured is the controlling factor in

determining the rights of the parties in a matter such as this, "the burden of

showing that a contract means other than it says must be squarely met by the

litigant making the contrary assertion." *Kenmont Coal Co. v. Wells*, 178 S.W.2d 7,

9 (Ky. 1944); *see also Louisville & N. R. Co. v. David J. Joseph Co.*, 183 S.W.2d

953, 955 (Ky. 1944) (holding that "words will be given their usual and ordinary

meaning when there is nothing to show they were used in a different sense").  The

court finds that the meaning of Clause I of the assignment is plain, and the court

further finds that the plaintiff has provided no reason to believe that these words

should be interpreted in anything but their usual sense.  Accordingly, the court

9

concludes that the intention of the parties expressed in Clause I of the assignment is clear: the SBA, and its successor Beal Bank, were (and remain) entitled to seek collection on the loan against the life insurance policy or the mortgaged property in whatever order they saw (or see) fit.

In addition, the plaintiff claims that "[t]he fact that separate premiums were paid for each item of coverage [the base policy and the rider] demonstrates that they were indeed separate and distinct policies." (DE 24-1 at 1.) She further claims that the loan for which the insurance policy was pledged was not extended, increased or modified in any way after her husband modified the policy. (DE 15-2 at 3.) Therefore, she concludes that in attempting to recover the entire amount due under the policy, "Beal Bank simply seeks a windfall to which it is not entitled and which was not a part of the collateral contemplated by the parties at the time the loan was made." *Id.*

As discussed above, at the very outset of the assignment agreement, George Mattingly agreed to "assign[] . . . Policy No. 041055891 issued by the Massachusetts Indemnity and Life Insurance Company . . . *and any supplemental contracts issued in connection therewith* (said policy and contracts being herein called the "Policy"), upon the life of George R. Mattingly . . . ." (DE 22-3 at 1 (emphasis added).) The court finds that the meaning of this language is also plain: George Mattingly assigned all contracts issued in connection with the enumerated base policy to the SBA as collateral for his loan. The court further finds that even if

10

the spouse riders are considered as separate contracts from the underlying enumerated policy – an issue which the court need not and will not reach – they are clearly the sort of supplemental separate contracts contemplated by the plain language of the assignment.[2]  Therefore, the mere fact that the spouse riders may have been separate insurance contracts issued in connection with the base life insurance policy is not enough to prevent Beal Bank from recovering the amounts due under the rider policy.  Instead, under the standard set forth in *Kenmont Coal* and elsewhere, the court must determine whether the plaintiff has shown that this plain language from the assignment contract should be interpreted in anything but its usual sense.

The plaintiff cites *Pool v. First National Bank*, 155 S.W.2d 4, 6 (1941), for the proposition "that a material alteration in the terms of an existing contract cannot be enforced unless a consideration for the change passes to the party against whom it is sought to enforce the altered condition[,]" and *McWilliams v.*

---

[2]  For example, the spouse riders are described throughout both the original and the amended insurance contracts as "attached riders," and the policy summaries for both insurance contracts set forth the annual premiums, issue dates, and coverage dates for both the riders and the base policy on the same page.  *E.g.*, DE 15-3 at 3, DE 15-4 at 3.

Moreover, based on these policy summaries, it appears that although the annual premiums due for both the spouse riders and the base policy were calculated separately, George Mattingly made single combined monthly premium payments for both the base policy and the spouse riders.  *See* DE 15-3 at 3, DE 15-4 at 3 (reflecting total monthly premiums of $21.62 for the base policy annual premium of $174.70 and the initial spouse rider annual premium of $52.80, as well as total monthly premiums of $40.08 for the base policy annual premium of $174.70 and the amended spouse rider annual premium of $247.10).

11

*Northwestern Mutual Life Insurance Co.*, 147 S.W.2d 79, 81 (1941), for the proposition that a promise to do what a party is already bound to do is not consideration at all.  The plaintiff also points out that "Beal Bank offered nothing more for the additional [amount] it now claims" it is entitled to recover, nor was any additional amount bargained for after George Mattingly modified his life insurance contract with MILICO.  (DE 15-2 at 4.)  Therefore, the plaintiff concludes that Beal Bank is not entitled to the sums due under the life insurance policy beyond the base policy amount of $30,000.

This argument, of course, does not bear upon the sum of $20,000 due under the original spouse rider for which George Mattingly contracted with MILICO in 1983 because this original spouse rider existed when George Mattingly assigned his life insurance policies to the SBA as collateral for a loan of $89,700.  In other words, despite the plaintiff's argument, Beal Bank's right to the amount due under the original spouse rider is supported both by the plain language of the assignment and by clear consideration.  Thus, before considering the plaintiff's consideration argument at any further length, the court finds that in addition to the sum due under George Mattingly's base policy, Beal Bank is also entitled to recover the sum of $20,000, plus accrued interest, due under the original spouse rider.

With respect to the remaining sum due under the amended spouse rider, the plaintiff's argument implies that Beal Bank made a deliberate and material alteration in the terms of its underlying loan and assignment contract with George Mattingly,

12

which cannot be enforced by Beal Bank because no consideration passed to George Mattingly for this change.  But Beal Bank did not make any change, deliberate or otherwise, to its contract with George Mattingly.  Instead, the only deliberate alteration occurred when George Mattingly modified his insurance contract with MILICO (and its successor Primerica) and increased the spouse rider coverage to $70,000; indeed, the plaintiff herself argues that neither Beal Bank nor the SBA "were even aware that the second policy existed."  (DE 15-2 at 2.)  The plaintiff's reliance on *Pool* and *McWilliams* is, therefore, misplaced: Beal Bank's claim on the additional sum due on the amended spouse rider is not the deliberate result of an unsupported renegotiation of its assignment contract with George Mattingly; rather, Beal Bank's claim on the additional sum is a byproduct of George Mattingly's renegotiation of his insurance contract with MILICO.

Although the plaintiff's reliance on *Pool* and *McWilliams* may be misplaced, she is nonetheless near the mark when she describes Beal Bank's claim on the additional sum as "a windfall" which may not have been contemplated at the time of the loan and assignment.  For its part, Beal Bank does not seriously contest this description of its claim.  Instead, Beal Bank observes that George Mattingly, despite his presumably "full knowledge of the Assignment's terms," nevertheless "chose to purchase the additional coverage" as either an amendment to the original insurance policy or a separate but supplemental policy; therefore, Beal Bank argues that it is entitled to the benefits of this decision, even if it may have been an unexpected

mistake.  (DE 22-5 at 5.)  In other words, Beal Bank argues that "[h]owever ill advised Mr. Mattingly's decision to include this additional coverage under the same policy may appear to the Plaintiff now, it simply is not a basis to ignore the terms of the Assignment[,]" which, on their face, suggest that Beal Bank is entitled to the full amount of the amended spouse rider.  *Id.*

Those "cases dealing with claims for payment made by providers of 'nonbargained benefits' . . . . are ordinarily assembled under the umbrella labelled 'restitution,' although they also refer to or include claims of unjust enrichment, quasi-contract, and quantum meruit."  Saul Levmore, *Explaining Restitution*, 71 Va. L. Rev. 65, 66 (1985); *see also* Eric Kades*, Windfalls*, 108 Yale L.J. 1489, 1515 (1999) (noting that "[t]he universe of 'nonbargained benefits' covered by unjust enrichment . . . includes everything from provision of unsolicited services to mistaken overpayments to contractual restitution for frustration, impossibility, or illegality").  In general, "[t]hree elements must be established in order that a plaintiff may succeed in a claim based on unjust enrichment": first, there must be "a benefit conferred on the defendant by the plaintiff"; second, there must be "an appreciation or knowledge by the defendant of the benefit"; and third, the defendant must accept or retain "the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." 26 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 68:5 (4th ed. 1993 & Supp. 2007) (emphasis added).  "The doctrine of unjust

14

enrichment has no application in a situation where there is an explicit contract which has been performed[,]" and unanticipated problems "do not give rise to subsequent awards when the parties are in an equal position as to knowledge and information surrounding the contract." *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. Ct. App. 1977) (citing, inter alia, *Miller v. Johns*, 163 S.W.2d 9 (1942)).  Because George Mattingly's knowledge of the terms of both the assignment and the amended insurance policy was at least equal, and likely greater, than the knowledge of Beal Bank and its predecessor, the court finds the plaintiff has failed to show that the doctrine of unjust enrichment should be applied to modify the plain language of the assignment contract.  Accordingly,

**IT IS ORDERED** that the motion by the defendant/third-party plaintiff to dismiss and for leave to deposit the insurance proceeds (DE 20) is **GRANTED**. Primerica shall pay the proceeds from the disputed insurance policy in the amount of $100,000, plus interest, into the court.  The check should be made payable to Clerk, U.S. District Court.

**IT IS FURTHER ORDERED** that any and all claims of the plaintiff against Primerica are **DISMISSED** with prejudice with each party to bear its own costs.

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment (DE 15) is **DENIED**.

**IT IS FURTHER ORDERED** that the third-party defendant's motion for summary judgment (DE 22) is **GRANTED**.

15

**IT IS FURTHER ORDERED** that the clerk of the court is **DIRECTED** to pay to Beal Bank, SSB the proceeds from the disputed life insurance policy deposited by Primerica with the clerk of the court, in the amount of $100,000, plus interest.


Signed on  September 20, 2007

*Jennifer B.Coffman*

**Jennifer B. Coffman, Judge**
**United States District Court**

16